UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOAN BROWN
   Plaintiff,

v.

UNITED STATES OF AMERICA
   Respondent.            Case No. DPAE: 2:19CR000501-00

---

**EMERGENCY MOTION FOR COMPASSIONATE RELEASE UNDER 18 USC 3582(c)(1)(A)(i)
PURSUANT TO THE FIRST STEP ACT OF 2018**

---

Comes now the plaintiff, Ms. Joan Brown to petition this court to grant an immediate CR/RIS pursuant to 3582(c)(1)(A)(i), under broadened parameters of the implementation of the First Step Act of 2018.

The plaintiff is currently housed in Danbury Prison Camp, in Danbury CT. This facility has been under severe scrutiny since the first wave of the pandemic back in 2020 where the inmates won a class action lawsuit against the prison due to the mishandling of the spread of pandemic, the inhumane conditions inmates were placed in, and the life threatening health crisis that arose once again due to the facilities' gross negligence, see (Martinez-Brooks v. Easter3:20-cv-00569-MP).

During the most recent wave of the virus, Omnicron variant, the facility has once again failed in what Senator's Blumenthal and Murphy call a shockingly reckless handling of the confinement of the virus, and contrary to BOP and CDC Guidelines, see (Exhibit A - a report on a letter sent by the senators to the Attorney General, the BOP Director and acting FCI Danbury Warden). Subsequent to the writing of the letter, on January 26, 2022 both Senators came to FCI Danbury to view the conditions at all three facilities, but most specifically those at the women's prison camp that their letter addressed, but were denied access to the camp, (where the plaintiff is housed), and where the infection of the virus was the highest hit and quarantine conditions were deplorable, see attached (Exhibit B - AP report on Senators denied access to women's facility, and Exhibit C - Detailed description of Danbury Camp's mishandling of infection, spread, and inhumane quarantine conditions).

In accordance to a memorandum from Attorney General Barr, subject Prioritization of Home Confinement as appropriate in response to COVID-19 pandemic (CARES ACT), dated March 26, 2020 he urged the BOP to utilize home confinement, where appropriate to protect the health and safety of the BOP personnel, and those in their custody. A week later AG Barr wrote an additional directive ordering the BOP to intensify their efforts to release vulnerable inmates such as Ms. Brown at the three prison complexes that were struggling to contain major outbreaks of the corona virus. Barr said he was seeking to speed the process of sending inmates at Danbury Conn., Oakdale, CA. and Elkton OH to home confinement because of the dangerous levels of infection at those facilities, (the CARES act was extended this past month by President Biden for another year).

Once again, beginning in December 2021 the infection rate has hit the BOP at dangerous levels, specifically highest at the prison camp in Danbury, CT where the plaintiff is currently incarcerated, see (Exhibit D - BOP Handling of pandemic, and Exhibit D-A - Danbury Handling of pandemic).

All of the foregoing facts regarding the conditions at the prison camp, the mishandling of the quarantining of inmates, and the gross negligence of medical staff in their care for the inmates in their custody are grounds for the granting of compassionate release for Ms. Brown due to her advanced age, she is 81 years old, will be 82 years old in August and her severe life threatening underlying medical conditions.

Of most dire concern is Ms. Brown's diagnosis of lymphoma, a diagnosis that was made on October 8, 2021 but wasn't made known to the plaintiff until January 28, 2022, see (Exhibit E - lymphoma diagnosis), a blatant disregard for the urgent care needed to treat this cancer, if it is treatable, this coupled with her extreme advanced age make the plaintiff highly susceptible to life threatening complications from the virus; be it of note that without the threat of the virus Ms. Brown is in need of adequate



TRULINCS ~~03148091  CARTATORE, MICHELLE~~ Unit: DAN-O-A

-------------------------------------------------------------------------------

medical care in the treatment of her cancer, which will not be done in the BOP, Ms. Brown was informed she wouldn't be scheduled to see an oncologist until sometime in March, five months after the initial diagnosis of this terminal cancer.

Additionally, Ms. Brown suffers from, Heart Disease, (Heart attack 1993, cardiac caterization 2010 & 2019 - implant of two stents), Hypertension, Type 2 diabetes, Gastrointestinal disease, and Hyperlipidemia  see (Exhibit F - medical records).

Numerous courts have granted CR/RIS to plaintiff's in Danbury FCI and across the country to inmates with much longer sentences, where violent offenses were committed, to much younger inmates and with less life threatening underlying medical conditions as those diagnosed for the plaintiff, see (Exhibit G - Case citings of recent CR/RIS grantings - highlighted cases from Danbury,CT.).

The plaintiff was sentenced for non violent offenses of theft, embezzlement, abstracton of funds by a credit union agent, and false credit entries.  Ms. Brown has served 6 months of her 41 month sentence, her release date is June 21, 2023, (halfway house release date) see (Exhibit H - Computation Data Sheet).  This remaining amount of time to serve could prove to be lethal due to the current conditions she is living in, and the high probability that if she remains in Danbury Federal Prison Camp she will again contract the virus, as it is proven the vaccine and boosters, or previous contraction of the virus do not preclude infection/reinfection.

The plaintiff has attended GED classes, has had no disciplinary reports and is categorized as minimal recidivism rate by the congressional Pattern scoring scale set forth in the FSA. Further, she is housed in a minimum security camp that has no fence and remains there on her own moral standard, thereby showing a level of societal adherence and safety.

Ms. Brown has exhausted her administrative remedies, see (Exhibit - I).

Ms. Brown has a valid release plan in place to live with her family friend, Ms. Marion Nuss located at 7415 Brous Avenue, Philadelphia, PA 19152, Tel. # 215-756-1839.

In conclusion, the plaintiff, Ms. Joan Brown implores this court to act on this motion in an emergency fashion, and grant Ms. Brown an immediate release due to the extraordinary and compelling reasons set forth herein.

The plaintiff requests the court to appoint counsel to supplement this CR/RIS filing and to represent her in any additional proceeding in it's regard.

Ms. Brown respectfully submits this motion to this court to decide with it's discretion, compassion, and the broadened scope of parameters for compassionate release set forth in the First Step Act of 2018, and grant Ms. Brown's immediate release.

Respectfully submitted this 30th day of January, 2022.

Ms. Joan Brown
FPC Danbury
33 1/2 Pembroke Road
Danbury, CT 06811

TRULINCS ~~33140054   CATTATORE, MICHELLE C~~  Unit: DAN-O-A    Exhibit (A)

--------------------------------------------------------------------------------

Washington Post, Bureau of Prisons director to resign after scandal-plagued tenure during pandemic (Jan 6)

CNN, Bureau of Prisons leader retiring under political pressure from lawmakers seeking his ouster (Jan 5)

Testimony of Michael Carvajal before the Senate Judiciary Committee (June 2, 2020)

Northwest Arkansas Democrat-Gazette, Two execs of prisons resigning
(Jan 7)
<><>

COVID ROILS THE BOP

BOP inmate COVID cases shot up last week at a rate not before seen. On the last reporting day in 2021, 1,194 inmate COVID cases were reported. Last Friday, the number shot up to 3,231, a number not seen since Jan 28 of last year. Last Thursday, the increase was 200% of the 21-day rolling average, the highest multiple ever recorded.

Staff cases aren't faring much better, up 110% in a week to 881 cases. COVID is now present in 127 facilities. The BOP reported two more inmate deaths, one at Beaumont and another at Lewisburg. The Lewisburg death occurred 11 months ago but only now has been recharacterized as COVID-related. However, the Beaumont death just occurred, and   as with more than 55% of all deaths since March 1, 2021   the deceased had previously been declared "recovered" from a bout of COVID.

As of last Friday, 74.2% of inmates and 69.4% of staff had been vaccinated. The BOP is not reporting how many people have gotten booster shots.

A New York emergency room physician said last week that COVID omicron is different in its effect on victims. "Like before, some [COVID patients] were really short of breath and needing oxygen. But for most, COVID seemed to topple a delicate balance of an underlying illness. It's making people really sick in a different way."

Bloomberg reported Saturday that a new COVID variant called "deltacron" has been identified in Cyprus. Leondios Kostrikis, a University of Cyprus professor and director of the Laboratory of Biotechnology and Molecular Virology, said, "There are currently omicron and delta co-infections and we found this strain to be a combination of the two. We will see in the future if this strain is more pathological or contagious or if it will prevail" over delta and omicron.

Last week, the BOP filed a motion to dissolve the preliminary injunction issued in July 2020 against FCC Lompoc in an inmate class-action lawsuit over COVID. That injunction identified inmates vulnerable to COVID and ordered the BOP to begin the process of CARES Act home confinement. Citing the Prison Litigation Reform Act and a Dec 10th Ninth Circuit decision in Ahlman v Barnes, the government is arguing that the PLRA automatically dissolves injunctions issued against prisons after 90 days.

The District Court has ordered briefing on the issue.

Questions about the BOP's COVID management at FCI Danbury - the focus of the first successful class-action COVID suit, Martinez v Brooks - are heating up again.

Senators Richard Blumenthal and Chris Murphy (both D-CT) and Rep Jahana Hayes (D-CT) last week sent a letter to the Attorney General, BOP Director, and acting FCI Danbury warden over "highly disturbing" reports on COVID at the facility. The letter alleges that over half of the women at Danbury camp tested positive on Dec 27 but weren't isolated or initially told whether they had the virus. "These actions, if true, are shockingly reckless and contrary to BOP and CDC guidelines," the letter said, and "endanger not only the women at the Camp, but also staff and the surrounding communities."

Inmate families protested outside of FPC Alderson last week, complaining about high COVID transmission and inmate mistreatment at the West Virginia women's facility. Allegations included that the prison lacked food, feminine products, commissary items, and hot water. Paul Petruzzi, an attorney representing some Alderson inmates, suggested the facility was not correctly using CARES Act home confinement authority, a complaint Alderson inmates have been making for the last year.

Finally, a media report last week about a COVID outbreak at FCI Ray Brook in upstate New York included an interesting observation. The Adirondack Daily Enterprise reported that last year, Ray Brook "had a COVID-19 outbreak which peaked at 130 inmates and 25 staff testing positive at one time. These numbers were only discovered weeks after the fact, when the corrections officer union for FCI Ray Brook   AFGE CPL33, Local 3882   raised concerns that the BOP was not publicly

TRULINCS ████████ ████████, MICHELLE ████ Unit: DAN-O-A          Exhibit (B)

-----------------------------------------------------------------------------------------------

████████ Kevin
████████
SUBJECT: Senators visit
DATE: 01/28/2022 12:51:29 PM

Senators say they were denied full access to federal prison
Two U.S. senators say they were denied access to parts of a federal prison in Connecticut while trying to examine conditions
there

By DAVE COLLINS <mark>Associated Press</mark>
January 26, 2022, 5:35 PM
 4 min read

Richard Blumenthal
Image Icon
The Associated Press
Sen. Richard Blumenthal, D-Conn., walks the halls of the Capitol in Washington, Wednes...Read More
Two U.S. senators said Wednesday that they were denied access to parts of a federal prison in Connecticut while trying to
examine conditions there in response to correctional officers' complaints about a staffing shortage and lack of coronavirus
precautions.

Concerns about the spread of COVID-19 itself were behind the denial, the federal Bureau of Prisons said.

Recent Stories from ABC News

Sens. Chris Murphy and Richard Blumenthal, both Connecticut Democrats, visited the Danbury Federal Correctional Institution
with labor union leaders and two state lawmakers. Murphy said they were barred from seeing the main women's facility but
were able to see a men's unit after a "fight" to gain access.

"There was clearly a decision made to try to stop both of us from seeing some of the conditions at this prison," Murphy said
during a news conference after the visit.

"This facility, even during COVID, should be open for inspection by policymakers," he said. "We need to see it during good
times, but we also need to see it during bad times. And if the Bureau of Prisons has decided that U.S. lawmakers are not going
to be able to see what is really happening inside these prisons during a crisis, that's a problem."

Blumenthal said prison officials rejected, at the last moment Wednesday morning, an itinerary given to the senators ahead of
the visit.

"The officials here said we'd love to have you come back when COVID is over," Blumenthal said. "We came here to see
conditions when COVID is the problem. That was the whole point."

The Bureau of Prisons said in a statement that Murphy and Blumenthal were given a tour of the prison "based on current
COVID-19 safety protocols."

"For health and safety reasons, portions of the tour were adjusted by the Warden to mitigate the spread of COVID-19 following
an increase in COVID-19 cases," the statement said.

The bureau did not immediately respond to other questions about correctional officers' concerns about staffing and coronavirus
protocols. A bureau spokesperson said responses were being prepared.

The senators basically were kept away from any areas where inmates were, said Shaun Boylan, a Danbury prison staffer and
executive vice president of the local prison staff union, Local 1661 of the American Federation of Government Employees. He
said prison officials had no objections to the original tour itinerary until Wednesday morning.

The tour was changed to include mostly empty areas, including a dining room for men and secure areas just outside the
housing units, Boylan said.

TRULINCS ██████████████████████ - Unit: DAN-O-A          *Exhibit B-2*

---

The Danbury prison complex houses 1,078 inmates, according to the bureau. Murphy and the local correctional officers' union say about 40% of the inmates are in isolation or quarantine because of the coronavirus.

The virus has been spreading widely again in federal prisons across the country. The Bureau of Prisons says it oversees more than 145,000 inmates in institutions and community-based facilities.

Of the total inmates, 8,074 currently are currently infected with the coronavirus and more than 1,640 of the 36,000 staff members are infected, according to bureau data.

Staffing levels and virus infections at prisons nationwide have been among numerous concerns under outgoing bureau Director Michael Carvajal, whose departure was revealed earlier this month.

Boylan said a staffing shortage in Danbury is requiring many correctional officers to work double shifts. Officers are exhausted, morale is low and conditions are dangerous, he said.

Staffing problems also are resulting in officers working in several units, which may be helping to spread the virus, Boylan said. And it is taking too long   two days   to receive virus testing results for staff, he said.

"We don't have the staff to stop the spread of coronavirus here because they're using the shortened numbers of staff, and they're going all over the place," Boylan said in a phone interview Wednesday.

Boylan said there are just over 80 correctional officers at Danbury, compared with 115 two years ago and 72 officers short of meeting the Bureau of Prisons' own staffing guidelines. While the bureau's goal is one officer per prison unit, the Danbury staff to unit ratio is 1 to 3, he said. Thirteen officers are out of work because of the virus, he said.

The bureau has said Danbury is more than 90% staffed, but the union doesn't agree with that number.

Blumenthal said he will be asking the Senate Judiciary Committee to investigate staffing at Danbury and other federal prisons.

Murphy, Blumenthal and U..S. Rep. Jahana Hayes, also a Connecticut Democrat, earlier this month called for a federal investigation of the Danbury prison complex after saying they received reports of officials not following coronavirus protocols.

Bureau of Prisons officials have previously said they follow the COVID-19 guidelines of the federal Centers for Disease Control and Prevention.

Exhibit C

~~[scribbled out lines]~~

**Detailed description OF DANBURY Camp's Mishandling of infection spread, inhumane conditions.**

To address the current conditions of Danbury FPC the petitioner submits to this court the following facts:

On or about December 12/21/21 one inmate tested positive for COVID-19 at Danbury FPC, Medical staff had all inmates tested at that point, and an additional ~~[crossed out]~~ four inmates tested positive for the virus. These four inmates were moved to the FPC visiting room for quarantine.

On 12/26/21 after requesting medical to test them for the virus due to symptoms they were suffering, another three inmates tested positive and were moved to the same quarantine room as those who had been quarantined there on 12/21/21.

On 12/27/21 once again after suffering symptoms of the virus and requesting to be tested an additional four inmates tested positive and they too were placed in the same quarantine room as those placed there on 12/21/21 and 12/26/21; thereby negating the quarantine effectiveness of the days already spent in that room - a mishandling of all COVID-19 Quarantine protocols.

EXHIBIT C-2

On 12/28/21 medical tested the remaining inmates at FPC, Approx. Sixty-nine inmates — less those eleven inmates currently housed in quarantine.

Several hours later the eleven inmates that were in FPC visiting room for quarantine were sent back to population (those who had all tested positive for COVID-19). There was no explanation given for this action, and they were moved back in the housing unit all open dorms and into bunkbeds with those cohs had previously tested negative for the virus.

All inmates were subsequently recalled back to their cubes. The staff came into one dorm (after several hours) and told approx. five inmates to pack up since they had tested negative for the virus and they were going to move all negative tested inmates to one dorm and positive to the other — after mingling all inmates together for several hours thereby negating the accuracy of the test results.

Staff soon realized this plan would not work as more than half of the population had tested positive for

the virus. Too many to be housed in one dorm. Fifty inmates had tested positive - thirty negative. Again, the court should note the inaccuracy of the numbers at this point due to the mingling of those tested positive and those negative for several hours and not retesting the inmates that had been in quarantine as far back as 12/21/21.

The staff halted the plan to move positive and negative inmates to separate dorms, and left all inmates together for several more hours while they decided on a course of action.

The decision was then made to move all those who had tested negative to quarantine, and leave the positive tested inmates in the housing dorms.

A list of names was called out of those who had tested negative. These inmates were told to grab their essentials and were told they would all be moving to the upstairs TV room to quarantine, (again these are the inmates who had tested negative).

⑧

Armie cds were brought in, and it became
apparant to STAFF once again that this
plan would not work as the TV room
wasn't large enough to house all those
women who had tested negative. They
then decided to move half of these
inmates to the visiting room - the
same room that those eleven inmates
that had tested positive for the virus
had been housed to quarantine, and had
just been moved back to population
several hours prior - without any
sanitation or decontamination being done.

~~_____~~

Fourteen inmates housed in the upstairs
TV room - its quarantine (negative tested
quarantine) ~~since~~ from 12/28/21 - 1/21/22

In addition to the foregoing facts of the
collossal mishandling of testing, separating
and quarantining of the inmates here at
FPC Danbury, the plaintiff submits the
following facts of the "dire" and inhumane
conditions ~~she has been enduring~~ since
12/28/21 in the upstairs TV room quasi
quarantine room.

9

Exhibit C-5

The Inmates ~~~~~~~~~~~~~~~~~~~~~~ hakes suffered under deplorable living conditions by only those housed/quarantined in the upstairs TV room quasi quarantine conditions that shall be detailed forthwith, however, the court should note that the number of inmates was reduced from fifteen to fourteen due to one of the inmates being removed (after three days of being housed with all the negative results) due to her suffering symptoms being tested and coming back with a positive result. At that point all remaining inmates should have been retested (those in the upstairs TV room where this inmate had been housed for three days), but this was not done — once again negating the effecacy of those test results.

~~~~~~~~~~~~~~~~~~ The Fourteen ~~~~~~~~~~~~~~~~~~~~~~~~~~~~ inmates housed in the upstairs TV room have had no access to emails, phone calls, legal calls or computers. This is a devastating condition to be unable to notify family members of their status or to find

out about their family members a critical need as the virus is spreading rampant all over the world

After a week of this a phone was placed in the visiting room where the other half of the inmates that tested negative were being housed, granting 24/7 access to that phone for those inmates, ~~████████~~ ~~██████~~ ~~████~~ Those housed in the upstairs TV room were allowed to use that phone for the very limited hours of 6am - 3pm. Access by walking outside in the sub freezing temperatures to walk to the visiting room

There is no shower in the ~~████████~~ quarantine once again — there is one in the visiting room quarantine. The ~~████~~ INMATES had to walk outside in subfreezing weather, sleet snow ice to take a shower. ~~██████~~ many did not have a coat or boots or shoes and was denied the request to get them from the dorm. ~~████~~ Inmates had to walk to and from shower and phone in these conditions with wet hair,

and improper clothing. The temperature on
9/11 high was seventeen degrees windchill
of __minus__ twenty!

These are conditions suffered ~~and~~ by the
plaintiff and those housed along with
her in the upstairs TV room, quas
quarantine room.

All other inmates have access to showers
phones and hotwater. The upstairs
TV room had no hotwater dispenser as
the dorms have or a microwave as
those in the visiting room quarantine
have. The access to showers and phones
was limited to 8am-3pm for all fourteen
inmates housed in the upstairs TV room.
The showers were cold due to those inmates
housed in the visiting room using all the
hotwater and access to phone is further
limited by their use of it during time
allotted for plaintiff and others in
her quarantine area.

It is inhumane and unbearable to be made
to wash your body and hair in cold water,
and then have to walk outside in below
freezing weather with wet hair and

12

improper clothing to return to quarantine area.

When these issues were brought to the attention of the executive STAFF at FPC, the response was, "it is what it is."

The ~~plaintiff~~ Inmates ~~————~~ had no access to hot water As tested earlier, For coffee or to cook the uncooked oatmeal served For breakfast unlike those positive tested inmates in the dorms and the other negative tested inmates in the visiting room

The meals have been delivered in a haphazard manner, For example on 1/3/21 breakfast was delivered at 10am, lunch one hour later at 11am, dinner at 4pm. No more access to food or a means to boil/heat anything.

Commissary has been limited to only hygiene items so again no way to even buy food.

Additionally, unlike those in the dorms who have access to daily (twice daily) pill line call's and the visiting room quarantine who have inmates who need daily insulin shots the plaintiff's quarantine area is rarely visited by medical STAFF or any executive STAFF. ~~————~~ Inmates had to yell

(13)

through the door crack to call the ~~Exhibit C-8~~

officers.

In addition to the fore going facts ~~that have been~~ presented to this court it is crucial that this court be made aware that on or about January 5, 2022 the Central Regional office representatives made an express visit to FPC Danbury to review the protocols set in place by the prison's executive staff in the handling of the vast infection of the virus.

The representatives were shown the common areas and the dorm areas where the positive cases were being quarantined. Those inmates were called to speak to the representatives to confirm the procedures executive staff had told them they were adhering to. After an inmate denied the validity of what the representatives had been told the dorms were "punished" and were not allowed to make phone calls for over a week.

~~Of more important do~~ is the fact that these representatives were not allowed to view the upstairs TV Room quarantine room, ~~nor were any~~ of the inmates including ~~allowed to~~ speak with them, a fact that can only be construed as a cover up of the inhumane quarantine conditions.

(14)

Additional Issues    Exhibit (C-II)
FPC Camp Danbury

Even during normal operation the camp's
at Danbury conditions are deplorable &
inhumane:

1) No Air conditioning, only one side of unit
has windows that certainly are useless
as the open on a downward slant for a
width of about 10". All the staff offices
have air conditioning. Last year 2021
there were 16 days of over 100° temps &
heat advisories.
We only have small **FANS** bought from
commissary (note: commissary hasn't had fans
in stock for almost 2 years). But now they
are planning to knock down the cube walls
where the plugs & lights are, so we won't even
have that relief. It is unbearable - No reason
to knock down cube walls - all camps have
rooms/cubes. FCI + FSL have open dorms
for security reasons, but we are minimum/
out custody so don't require this to be done.
It would make things exponentially worse
AC needs to be installed

2) The water is unpotable, it comes out

Exhibit C-1

Extremely cloudy — looks like a glass of
milk & smells like rotten eggs. We have to
brush our teeth with it, shower (causes rashes)
& wash hair & body (hair falls out).

Our access to our track (outside rec has
been closed since October 2021. A step
was broken and instead of fixing it
they came & boarded up the entrance
to the steps & it has remained that way
for almost 4 months now. Even death
row inmates get outside rec, FSL & FCI
have access to rec yard — we do not.

When being housed in upstairs TV Room quarantine
and being made to walk to shower in
sub zero temps, snow, sleet etc. Staff wouldn't
allow us to get pants, boots, or coats. ~~B~~ Had
to walk in shorts w/ the one coat they brought
up for all of ~~them~~ to use — Very unhygenic esp.
during a pandemic... Ditto w/ boots they
brought one pair for ⊗ all to wear to shower.

*Exhibit D*

TRULINCS 83140054 - CANTATORE, MICHELLE C - Unit: DAN-O-A

*( BOP Handling of Pandemic )*

-----------------------------------------------------------

Torres v Milusnic, Case No CV 20-4450 (CD Cal Jan 18, 2022)

Wall Street Journal, Third Dose of Pfizer, Moderna Covid-19 Vaccines Offers Strong Protection Against Omicron (Jan 21)

Feds for Medical Freedom v Biden, Case No 3:21-cv-356, 2022 US Dist LEXIS 11145 (SD Tex Jan. 21, 2022)

BOP COVID webpage (Jan 23)

News-Times, Reports from FCI Danbury show little change since legislators call for change (Jan 16)
<><>

HOUSE SUBCOMMITTEE WITNESSES SAVAGE BOP'S COVID RESPONSE

Witnesses blasted BOP healthcare, CARES Act and compassionate release response at a House of Representatives Subcommittee on Crime, Terrorism and Homeland Security hearing on what Rep Jerry Nadler (D-NY) called "BOP's troubling response to the COVID-19 pandemic and its inability to protect inmates and staff adequately."

Nadler, chairman of the full House Committee on the Judiciary, said the BOP has a duty "to make sufficient use of the authority granted to it under the CARES Act to place certain prisoners at home confinement earlier than previously permitted by statute."

Epidemiologist Homer Venters, who has inspected some 40 prisons since the pandemic began, testified that "my investigations have revealed a disturbing lack of access to care when a new medical problem is encountered." Additionally, he argued that "there's a compelling and unrealized rationale for release of high-risk patients who pose minimal public safety risks. This approach is even more important now to consider during the omicron outbreaks because of the tremendous lack of staffing inside facilities."

Venters faulted the lack of any independent review of reported BOP COVID-19 deaths, "including those that occurred in private facilities." He argued that "the lack of independent assessment in how [inmate COVID] deaths are reviewed and more broadly the lack of meaningful oversight by a health organization" is a fundamental problem.

"Every other sector of health care in the United States has independent and professional health organizations reviewing the quality of care," Venters told the Subcommittee, "but in the BOP we leave those crucial assessments to law enforcement to review its own provision of health care  The BOP is left to make its own assessments about the quality and scope of health care and only sporadic investigations by the Inspector General of the Dept of Justice provide alternative viewpoints. This is wholly insufficient and leaves incarcerated people at a systemic disadvantage because the organizations and structures that measure and promote health for the rest of the nation for the rest of us are excluded from the care people receive in the BOP."

University of Iowa law professor Allison Guernsey echoed the problems with the BOP's self-reporting of inmate COVID numbers. "There are serious questions about the veracity of the BOP's infection and death data. Not only do these questions cast doubt on the handling of the pandemic but they have real-world impact on the adjudication of compassionate release motions."

She noted the BOP has delayed reporting some COVID deaths for as much as a year and that even now, Freedom of Information Act data she obtained from the BOP show inmate deaths that the BOP has never publicly acknowledged. What's more, she said, BOP numbers "don't include anyone who died in a privately managed facility with a federal contract [which she reported totaled 17] " Also, she testified, "the Bureau of Prisons has admitted that its cumulative infection rate doesn't include anyone who caught COVID and was then released from prison."

With Guernsey's numbers, the BOP's inmate COVID death total is at least 301 inmates.

Guernsey argued that "the accuracy of the data matters" because "courts rely on it routinely in granting compassionate release, and if a judge misjudges the COVID risk based on inaccurate data, people that we know are medically vulnerable will be left in prison to die." She asked the Subcommittee to take steps to "require the BOP to report accurate and verifiable data."

Subcommittee on Crime, Terrorism, and Homeland Security, Hearings: The First Step Act, The Pandemic, and Compassionate Release: What Are the Next Steps for the BOP? (Jan 21)
<><>





TRULINCS  83███ - ██████ ████ - Unit: DAN-O-A

--------------------------------------------------------------------------------



SUBJECT: COVID Rages and ~~Venter Vents~~ — LISA Newsletter for January 24, 2022
DATE: 01/23/2022 11:06:10 PM

LISA publishes a free newsletter sent every Monday to inmate subscribers in the Federal system.

Edited by Thomas L. Root, MA, JD

Vol. 8, No. 4
<><>

COVID Cases Shatter BOP Record
House Subcommittee Witnesses Savage BOP's COVID Response
Case Shorts

<><>

BREAKING RECORDS

The Bureau of Prisons broke its prior inmate COVID record last week, ending Friday with 9,020 active cases. This is 17% higher than the previous worst week ever for COVID, when the BOP reported 7,690 sick inmates 56 weeks ago, on December 28, 2020.

At the same time, 1,432 BOP staff are down with COVID, a 52% increase in a week. Two more inmate deaths have been reported, two women, ages 30 and 59, at FPC Alderson.

The worst COVID conditions as of Friday were Yazoo City Medium (664 cases); Carswell (316 cases); and Herlong, Lompoc, Berlin, Yazoo City USP, Loretto, Los Angeles MDC and Marianna, all with more than 200 cases. Another 21 facilities reported between 100 and 200 cases.

Last Tuesday, the federal judge hearing the BOP's motion to dissolve a July 14, 2020, preliminary injunction ordering the release of vulnerable inmates to home confinement ruled that two facility reports by Dr Homer Venters, a court-appointed expert, were admissible in the case, despite BOP objections. The judge held that the reports "have sufficient guarantees of trustworthiness, are more probative regarding the conditions at Lompoc than other evidence."

The court asked Venters for an update on Lompoc conditions, just as a local newspaper reported that 294 Lompoc inmates had COVID.

Despite complaints to the Attorney General by Sens Richard Blumenthal and Chris Murphy, and Rep Jahana Hayes (all D-CT) over what they described as "highly disturbing" reports that FCI Danbury was not following COVID-19 isolation guidelines, conditions "appear to have improved little" at the facility, according to allegations by BOP staff and a lawyer involved in the inmate COVID lawsuit. Staff is "still not being provided appropriate personal protective equipment, according to Professor Sarah Russell, director of the Legal Clinic at Quinnipiac University School of Law."

The BOP told the News-Times the agency follows CDC guidance, "the same as community doctors and hospitals, with regard to quarantine and medical isolation procedures, along with providing appropriate treatment."

Last Friday, the CDC reported that Pfizer and Moderna vaccine effectiveness against hospitalization from Omicron was 81% for 6 months after dose two, 59% after six months, and 90% at least two weeks after a booster dose.

The report was issued the same day a Texas federal court halted President Biden's federal employee vaccine mandate. This means that the 30% of BOP employees who have so far ignored the order when it was in place are unlikely to get a vaccine now that it's gone away.

Not that vaccinations matter in the real world that much. As of last Friday, the BOP reports it has fully inoculated over 100% of FMC Carswell inmates (if that's possible). Yet 312 inmates have COVID.

Santa Maria Times, 294 Lompoc federal prison inmates, staff test positive for COVID-19 (Jan 21)

1/24/2022 12:05 ... Novanee Health ... MRD ... 14/32

1/28/22 - Date received by inmate

Exhibit (E)

Patient Name: BROWN, JOAN                    DOB: 8/10/1940   MRN: MG50058512; CDN07465782

---

### *Surgical Pathology Report*

| Accession: | Collected Date/Time: | Received Date/Time: | Pathologist: |
|---|---|---|---|
| DW-21-000290 | 10/7/2021 10:20 EDT | 10/8/2021 07:50 EDT | Pathan, Nusrat F, MD |

**Flow Cytometry Report**

**CLINICAL INFORMATION :**

Lymphocytosis

**SOURCE :**

Peripheral blood

**DIAGNOSIS :**
**PERIPHERAL BLOOD:**
**INVOLVEMENT BY B-CELL LYMPHOMA/LEUKEMIA, 32% OF TOTAL CELLS.**

*Immunophenotyping by flow cytometry analysis was performed and interpreted at Integrated Oncology Reference. See their attached report for complete details.*

10/11/2021 17:46      By: Nusrat F Pathan MD
                      (Electronic Signature)

Danbury Hospital Department of Pathology and Laboratory Medicine
24 Hospital Avenue, Danbury, CT 06810      203-739-7453
CLIA# 07D0101031, HP-0206, BB-1023, PFI 3327 Daniel L Cruser, MD, Director

**IMMUNOPHENOTYPE :**

See attached report.

**INTERPRETATION :**

See attached report.

**COMMENT :**

Per report, a subset of B cells appears to express dim CD10. Clinical morphologic and cytogenetic/FISH correlation will be necessary for exclusion of a follicle center cell lymphoma.

**Addendum Report**

**COMMENT:**
Pathologist has reviewed outside report, and has confirmed accuracy of patient identification.

---

LEGEND: c=Corrected, @=Abnormal, C=Critical, L=Low, H=High, f=Result Comment, i=Interp Data, *=Performing Lab



Exhibit (E-2)

Patient Name: BROWN, JOAN                    DOB: 8/10/1940   MRN: MG50058512; CDN07465782

---

### *Surgical Pathology Report*

| Accession: | Collected Date/Time: | Received Date/Time: | Pathologist: |
|---|---|---|---|
| DW-21-000290 | 10/7/2021 10:20 EDT | 10/8/2021 07:50 EDT | Pathan,Nusrat F,MD |

**ADDENDUM DIAGNOSIS:**
**SEE SCANNED REFERENCE LABORATORY REPORT (CLICK ON IMAGE BUTTON TO VIEW REPORT)**

10/13/2021 15:39      By: Nusrat F Pathan MD
                                   (Electronic Signature)

Danbury Hospital Department of Pathology and Laboratory Medicine
24 Hospital Avenue, Danbury, CT 06810     203-739-7453
CLIA# 07D0101031, HP-0206, BB-1023, PFI 3327 Daniel L Cruser, MD, Director

---



Patient Name: BROWN, JOAN  
Date of Birth: 8/10/1940

MRN: CDN074657828; DH10085070; MG50058512  
FIN: 0005651029; CDN1001049893

*Auth (Verified)*

10/11/2021 04:32:34 PM  
TO:2037499042 ATTN:  
FROM:LABCORP SPEC TESTING TO:+12037499042

Exhibit (E-3)

Page 2 of 3

---

## Integrated ONCOLOGY

### Hematopathology Report
### Flow Cytometry Analysis

| Patient Name | | Order # | Specimen # | Case # |
|---|---|---|---|---|
| **Brown, Joan** | | 21-48854 | 71434378-SH | 71417952 |

| Birth Date | Age | Gender | Client Specimen ID | Account # |
|---|---|---|---|---|
| 08/10/1940 | 81 Y | Female | DW-21-000290 | 769140 |

| Referring Physician | | Treating Physician | Client Lab ID | Danbury Hospital |
|---|---|---|---|---|
| Nusrat Pathan | MD | | DW-21-000290 | 24 Hospital Avenue |
| Tel:  203-739-7453 | | | Client Hospital ID | Second Floor Tower Building |
| Fax:  203-749-9042 | | | 50058512 | Danbury          CT    06810 |
| | | | | USA |

| Collection Date | Received Date | Processed Date | Container(s) Received | |
|---|---|---|---|---|
| 10/07/2021 10:20 AM | 10/08/2021 10:06 PM | 10/11/2021 3:44 PM | 1 Purple Top Tube 5ml | |

| Clinical Summary and Indication | Body Site |
|---|---|
| Lymphocytosis, evaluate for CLL. | - Peripheral Blood |

### Interpretation

**PERIPHERAL BLOOD:**
**- Involvement by B cell lymphoma/leukemia, 32% of total cells.**

Comment

A subset of B cells appears to coexpress dim CD10. Clinical, morphologic and cytogenetic/FISH correlation will be necessary for exclusion of a follicle center cell lymphoma.

Phenotype

A monoclonal kappa B-cell population is present (32% of total cells). The clonal B cells are positive for CD19, CD20 and weak CD38, a small subpopulation appears to be CD10 positive as well. They do not coexpress CD5, CD11c, CD23 and CD103. A significant population of CD38 bright plasma cells is absent. T-cells (10% of total cells) do not show pan T-cell antigen deletion. CD4:CD8=5.6:1. CD56+ T/NK-large granular lymphocytes are within normal limits (3% of total cells). There is no increase in CD34 and/or CD117 positive blasts, and they comprise <0.1% of total cells. No abnormal myeloid maturation is seen. Mature monocytes with a normal immunophenotype (CD14 and CD64 positive) are 4% of total cells.

Reviewing Pathologist

Henry Y Dong, M.D., Ph.D.          800-447-5816

---



| Viability & Abnormal Cells | | Cell Distribution | |
|---|---|---|---|
| Viability | 88 % | Lymphocyte Gate | 47.68 % |
| Abnormal Cells | Yes | Blast Gate | 0.20 % |
| % Abnormal Cells | 32% | Monocyte Gate | 5.77 % |
| Cell Size | Small | Granulocyte/Myeloid Gate | 46.36 % |
| | | Erythroid/Plasma Cell Gate | 0.05 % |

The above estimated percentages are based on the scattergram of CD45 vs. Side Scatter. Not all cells in the

1  of  2



Patient Name: BROWN, JOAN
Date of Birth: 8/10/1940

MRN: CDN074657828; DH10085070; MG50058512
FIN: 0005651029; CDN1001049893

Exhibit (E-4)

* Auth (Verified) *

10/11/2021 04:52:54 PM
TO:2037499042 ATTN:

FROM:LABCORP SPEC TESTING TO:+12037499042                Page 3 of 3

### Integrated ONCOLOGY

**Hematopathology Report**
**Flow Cytometry Analysis**

Patient Name
**Brown, Joan**

Order #
21-48654

Specimen #
71434378-SH

Case #
71417952

"blast gate" may be true blasts, hence the blast gate percentage may not accurately reflect true blast count.

| Lymphoid Associated | | Myeloid Associated | | Miscellaneous Markers | |
|---|---|---|---|---|---|
| sKappa | Moderate | CD11b | Negative | CD10 | Dim in subset |
| sLambda | Negative | CD11c | Negative | CD34 | Negative |
| CD2 | Negative | CD13 | Negative | CD117 | Negative |
| CD3 | Negative | CD14 | Negative | CD38 | Dim |
| CD4 | Negative | CD15 | Negative | HLA-DR | Negative |
| CD5 | Negative | CD33 | Negative | CD45 | Bright |
| CD7 | Negative | CD64 | Negative | CD25 | Negative |
| CD8 | Negative | | | CD23 | Negative |
| CD19 | Moderate | | | CD103 | Negative |
| CD20 | Moderate | | | | |
| CD56 | Negative | | | | |

  

Electronically Signed By

Henry Y Dong, M.D., Ph.D.          800-447-5816

Reported Date

10/11/2021

Technical Component-Processing performed at Esoterix Genetic Laboratories, LLC, 3 Forest Parkway, Shelton, CT 06484, 800-447-8881, Jonathan Klein, M.D., Medical Director  CLIA# 07D2141076 CT Lic. # CL-4888
Technical Component-Analysis and Professional Component performed at Esoterix Genetic Laboratories, LLC, 533 W 57th Street 5th Floor , New York, NY 10019, 800-447-8881  Henry Y. Dong, M.D., Medical Director  CLIA# 33D0653394

This interpretation or diagnosis is contingent on the specimen and the clinical information received. This analysis is an adjunct to the evaluation of the referring physician and does not represent a final diagnosis.
This test was developed and its performance characteristics have been determined by Esoterix Genetic Laboratories, LLC. It has not been cleared or approved by the FDA. The FDA has determined that such clearance or approval is not necessary. The laboratory is regulated under the Clinical Laboratory Improvement Amendments of 1988 (CLIA) as qualified to perform high complexity testing.
Integrated Oncology is a business unit of Esoterix Genetic Laboratories, LLC, a wholly-owned subsidiary of Laboratory Corporation of America Holdings.

2 of 2



*Exhibit F*

## Bureau of Prisons
## Health Services
## Clinical Encounter

*Heart Attack/Stents*

| Inmate Name: | BROWN, JOAN P | | | Reg #: | 77425-066 |
|---|---|---|---|---|---|
| Date of Birth: | 08/10/1940 | Sex: | F   Race: WHITE | Facility: | DAN |
| Encounter Date: | 08/26/2021 12:19 | Provider: | Greene, Robert T. Jr. | Unit: | Q01 |

Chronic Care - 14 Day Physician Eval encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT  **1**          Provider:  Greene, Robert T. Jr. (MAT) M.D.,
Chief Complaint:   CARDIAC
Subjective:   08/26/21
Inmate was seen today for CCC.  H/O a heart attack in 1993.  Endorsing a h/o cardiac catherization in 2010 and 2019.  At each catherization a stent was placed.  Thus, inmate currently has two stents in place.  Today, she voices no issues of concern.
Pain:          Not Applicable

COMPLAINT  **2**          Provider:  Greene, Robert T. Jr. (MAT) M.D.,
Chief Complaint:   HYPERTENSION
Subjective:   08/26/21
Seen today for CCC.  Diagnosed in 2014 with HTN.  Inmate reports that she is compliant with her medication and she voices no issues of concern.
Pain:          Not Applicable

COMPLAINT  **3**          Provider:  Greene, Robert T. Jr. (MAT) M.D.,
Chief Complaint:   DIABETIC
Subjective:   08/26/21
Seen for CCC.  Diagnosed in 1995 with type 2 DM.  Reporting no h/o any use of insulin.  Compliant with current medication.  Endorsing no complaints today.
Pain:          Not Applicable

COMPLAINT  **4**          Provider:  Greene, Robert T. Jr. (MAT) M.D.,
Chief Complaint:   GASTROINTESTINAL
Subjective:   08/26/21
Seen for CCC.  Long standing h/o GERD since 2014.  Reporting that her current medication works well for her.  Voicing no concerns today.
Pain:          Not Applicable

COMPLAINT  **5**          Provider:  Greene, Robert T. Jr. (MAT) M.D.,
Chief Complaint:   ENDO/LIPID
Subjective:   08/26/21
Seen for CCC.  Diagnosed with hyperlipidemia in 2018.  Inmate reports that she monitors her dietary intake.  Today, she is without concerns.
Pain:          Not Applicable

**Seen for clinic(s):** Endocrine/Lipid, Gastrointestinal, Diabetes, Hypertension, Cardiac
**Added to clinic(s):** Endocrine/Lipid, Gastrointestinal, Diabetes, Hypertension, Cardiac

**OBJECTIVE:**

Exam:

General
Affect
Yes: Pleasant, Cooperative
Appearance
Yes: Appears Well, Alert and Oriented x 3

23

*ER-VISIT*

## Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

*Exhibit F-2*

| | | | | |
|---|---|---|---|---|
| Inmate Name: | BROWN, JOAN P | | Reg #: | 77425-066 |
| Date of Birth: | 08/10/1940 | Sex: F    Race: WHITE | Facility: | DAN |
| Note Date: | 09/15/2021 20:55 | Provider: Greene, Robert T. Jr. | Unit: | O02 |

Admin Note - Report Review encounter performed at Health Services.
**Administrative Notes:**

ADMINISTRATIVE NOTE   **1**         Provider:   Greene, Robert T. Jr. (MAT) M.D., RPh.,C.D.

09/15/21
I have reviewed this inmate's available medical file for recent labs, tests, and encounters and
found this treatment to be clinically indicated at this time.As per our earlier conversation, regarding patient
Joan Brown, DOB 8/10/1940, she was recently admitted to Danbury hospital under my care for weakness and
a near syncopal event. She was found to be more anemic than usual and also found to have Acute kidney
injury. She was given IV fluids and a blood transfusion which improved both her Acute kidney injury and
Anemia respectively.
She did not have any gastrointestinal bleeding. She was transfused a unit of packed red blood cells and
afterwards she felt better. Her hemoglobin stabilized and she was given instructions to follow-up as an
outpatient. She was discharged on September 12, 2021.

I just received word from our pathology department today that a peripheral smear was done while she was
inpatient and that the results have come back concerning for a possible lymphoproliferative disorder that may
explain her anemia. The pathologist has recommended flow cytometry testing to better decipher the cause of
her anemia and to better deduce the results of the peripheral smear.

If you have any questions, please do not hesitate to contact me at 203-460-0235

Thank you

Khaled Carvan, MD
Danbury Hospital Hospitalist Department

**New Consultation Requests:**

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Hematology | 09/27/2021 | 09/27/2021 | Urgent | No | |

Subtype:
consultation - CT Oncology + Hematology
Reason for Request:

As per our earlier conversation, regarding patient Joan Brown, DOB 8/10/1940, she was recently admitted to
Danbury hospital under my care for weakness and a near syncopal event. She was found to be more
anemic than usual and also found to have Acute kidney injury. She was given IV fluids and a blood
transfusion which improved both her Acute kidney injury and Anemia respectively.
She did not have any gastrointestinal bleeding. She was transfused a unit of packed red blood cells and
afterwards she felt better. Her hemoglobin stabilized and she was given instructions to follow-up as an
outpatient. She was discharged on September 12, 2021.

I just received word from our pathology department today that a peripheral smear was done while she was
inpatient and that the results have come back concerning for a possible lymphoproliferative disorder that
may explain her anemia. The pathologist has recommended flow cytometry testing to better decipher the
cause of her anemia and to better deduce the results of the peripheral smear.

If you have any questions, please do not hesitate to contact me at 203-460-0235

Generated 09/15/2021 21:03 by Greene, Robert T. Jr.         Bureau of Prisons - DAN                  Page 1 of 2



*Exhibit F-3*

| | | |
|---|---|---|
| Inmate Name: BROWN, JOAN P | | Reg #: 77425-066 |
| Date of Birth: 08/10/1940 | Sex: F   Race: WHITE | Facility: DAN |
| Encounter Date: 09/15/2021 14:16 | Provider: Escobar, Werner FNP | Unit: O02 |

**Appearance**
   Yes: Alert and Oriented x 3
**Nutrition**
   Yes: Within Normal Limits

**Skin**
   **General**
      Yes: Within Normal Limits
**Pulmonary**
   **Observation/Inspection**
      Yes: Within Normal Limits
   **Auscultation**
      Yes: Clear to Auscultation
**Cardiovascular**
   **Observation**
      Yes: Within Normal Limits
   **Auscultation**
      Yes: Normal S1 and S2
**Peripheral Vascular**
   **General**
      Yes: Within Normal Limits
**Gastrointestinal**
   **General**
      Yes: Within Normal Limits
**Genitourinary**
   **General**
      Yes: Within Normal Limits
**Musculoskeletal**
   **Gait**
      Yes: Normal Gait
**Mental Health**
   **Orientation**
      Yes: Alert and Oriented x 3

*Hypertension*
*Anemia*

**Exam Comments**

Post Hospitalization:

Patient reports to health services to follow up post hospitalization from 09/10-09/12 where she was hospitalized for anemia and received 1 unit of blood due to anemia. She presents without any complaints of dyspnea, shortness of breath or fatigue. A recommendation for discontinuation of lisinopril was made however I will continue medication as patient has a long history of hypertension and has been on medication x 5 years. I will continue to monitor patient and adjust medications if needed. She has good S1 and S2, lungs are clear and has no s/s of fatigue. I will recommend she have blood pressure checks and have CBC lab draw in 1 month. She is aware to follow up as needed.

**ASSESSMENT:**

Anemia, unspecified, D649 - Current



*Exhibit 6*

TRULINCS 83140054 - CANTATORE, MICHELLE - Unit: DAN-O-A

*# DANBURY Conditions #*
*Granting of*
*CR/RIS*

------------------------------------------------------------

FROM: Projects LLc, Samaritan
TO: 83140054
SUBJECT: Samaritan Newsletter 30 December 2021
DATE: 12/30/2021 03:06:10 PM

SAMARITAN PROJECTS LLC
P.O. Box 315
Billings, MO 65610-0319
samaritanprojects@hotmail.com
417-832-9155

30 December 2021

The Samaritan Project LLC conducts research for federal inmates. We prepare 18 U.S.C. 3582(c) Compassionate Release/Reduction in Sentence (CR/RIS) motions, 28 U.S.C. 2255 motions, and 28 U.S.C. 2241 motions for attorneys. We go behind court decisions, look at the docket to see what judges have done in their unpublished opinions, and provide real information. If you like our newsletter, ask others to add us to their corrlinks.

HOBBS ACT/CAREER OFFENDER. The District of Maryland granted the CR/RIS motion filed by Anthony Griffin. United States v. Griffin, 2021 U.S. Dist. LEXIS 244190 (D. Maryland December 22, 2021). The PSR determined that Griffin qualified as a career offender under U.S.S.G. 4B1.1 on the basis of his current offense, as well as his prior Maryland convictions for assault with intent to rob and two counts of robbery with a deadly weapon.  Of import here, in United States v. Green, 996 F.3d 176 (4th Cir. 2021), the Fourth Circuit recently held that "Hobbs Act robbery is not a crime of violence under the career offender provision of the Sentencing Guidelines." Id. at 184. Therefore, if  Griffin were sentenced today, he would not qualify as a career offender. The government concedes, as it must, that as a result of Green, "it is true that Petitioner would not face the same guidelines range if he had been sentenced today."

INADEQUATE CARE/PRISON CONDITIONS: The District of Connecticut granted, in part, the CR/RIS motion filed by Arcadio Dones. United States v. Dones, 2021 U.S. Dist. LEXIS 243953 (D. Connecticut December 22, 2021). Dones argued the following bases for a finding of extraordinary and compelling reasons to warrant a reduction in his sentence: (1) the "exceptionally harsh, isolating and restrictive" nature of his imprisonment, (2) the lack of "services, care or support" in his facility, (3) the continuing risk posed by the COVID-19 pandemic, and (4) his "strong rehabilitation." The Court found that numerous courts have granted motions for compassionate release based upon the theory that the COVID-19 pandemic has created disproportionately harsh sentences and limited the rehabilitative resources available to incarcerated people. See United States v. Mcrae, 17 Cr. 643 (PAE), 2021 WL 142277, at *5 (S.D.N.Y. January 15, 2021) ("In the Court's judgment, a day spent in prison under extreme lockdown and in well-founded fear of contracting a once in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison."); see also United States v. Hatcher, 2021 WL 1535310, *2 (S.D.N.Y. April 19, 2021) (granting early release notwithstanding receipt of COVID-19 vaccine because, among other things, defendant "has been unable to receive mental health care, drug abuse treatment, and other important services that the Court envisioned her receiving while incarcerated") United States v. Sherrod, No. 19-20139, 21 WL 3473236, at *3 (E.D. Mich. Aug. 6, 2021) (noting that the placement of an incarcerated person in quarantine for administrative convenience was an "extreme" and "disturbing" measure). In the present case, the Court found Dones has been confined in quarantine and his lack of access to rehabilitative services while in custody. Dones describes much of his time in quarantine as being kept in his cell for almost twenty-four hours a day for weeks. (Id. at 12.) Even when he was not subject to quarantine, Dones was not allowed out of his cell for more than sixty minutes per day. (Id.) What is more, he reports receiving no drug rehabilitation counseling, no vocational training, no English language instruction no programming or training whatsoever since the pandemic began. (Id. at 13.) These conditions of confinement are extraordinary and are practically a form of solitary confinement

The Fourth Circuit vacated the district court decision denying the 2255 filed by Eric Thompson. United States v. Thompson, 2021 U.S. App. LEXIS 36765 (4th Cir. 2021). Thompson claimed that his trial counsel rendered ineffective assistance by failing to object at sentencing to a life term of supervised release. Thompson's 2421 offense was not perpetrated against any minors, see USSG 5D1.2 cmt. n.1 (defining "minor"), and therefore USSG 5D1.2(b)(2) does not apply.

2255/COA/BORDEN. The Tenth Circuit granted a Certificate of Appealability to Joel Elliott. United States v. Elliott, 2021 U.S. App. LEXIS 38098 (10th Cir. December 23, 2021). At the time of the district court's ruling, this court had held that an offense that can be committed with a mens rea of recklessness can serve as a qualifying crime of violence under 18 U.S.C. 924(c)(3) (A). See United States v. Mann, 899 F.3d 898, 902-08 (10th Cir. 2018). This court had likewise held that an offense committed with a mens rea of recklessness can serve as a qualifying "violent felony" under 924(e)(2)(B) of the Armed Career Criminal Act. See United States v. Pam, 867 F.3d 1191, 1207-08 (10th Cir. 2017), abrogated by Borden v. United States, 141 S.Ct. 1817

*Exhibit 6-2*

TRULINCS 83██40054 ██ANTATOR, M██ELLE ██ - Unit: DAN-O-A

--------------------------------------------------------------------------------

FR██████████████, ██████████
T██████████
SUBJECT: 1.17.22. S██████ Newsletter
DATE: 01/17/2022 07:06:07 PM

1.17.22. S██████ Newsletter

S██████ PROJECTS LLC
██████████
B████████, M█ █████ ████
s██████████████████████
4██ ███ ████

*Post Conviction /*
*Rehabilitative Efforts*
*Factor!*

*Sample CR/RIS Release*
*Grantings*

SUPREME COURT. The Supreme Court granted certiorari in Kemp v. United States, Case 21-5726 (Jan. 10, 2021). The Court will decide whether Federal Rule of Civil Procedure 60(b)(1) authorizes relief based on a district court's error of law. The Fifth and Tenth Circuits have held that Rule 60(b)(1) encompasses "obvious" legal errors. See Benson v. St. Joseph Regional Health Ctr., 575 F.3d 542, 547 (5th Cir. 2009) ("Our rule is that a Rule 60(b)[1] motion may be used 'to rectify an obvious error of law, apparent on the record.'") (quoting Hill v. McDermott, Inc., 827 F.2d 1040, 1043 (5th Cir. 1987)); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 578 (10th Cir. 1996) ("The Tenth Circuit has made it clear that certain substantive mistakes in a district court's rulings may be challenged by a Rule 60(b)(1) motion."); Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991) ("However, such relief is available only for obvious errors of law, apparent on the record."). The Eleventh Circuit took the opposite view creating a circuit split.

SUPREME COURT/REQUEST FOR CERTIORARI. Thacker v. United States, Case 21-877. Issue: Whether a district court may consider the 2018 amendment to the sentences mandated by 18 U.S.C. 924(c) in determining whether a defendant has shown "extraordinary and compelling reasons" warranting a sentence reduction under 18 U.S.C. 3582(c)(1)(A).

FSA/APPEAL/COMBINATION OF FACTORS. The Fourth Circuit vacated the Eastern District of Virginia decision to deny the CR/RIS motion filed by Francis Davis. United States v. Davis, 2022 U.S. App. LEXIS 1078 (4th Cir. January 13, 2022). "A district court abuses its discretion when it acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error of law." Rehabilitation efforts can be considered as "one among other factors. The district court did not consider the actual details of Davis's rehabilitation in combination with the other circumstances but rather simply determined that rehabilitation could not establish an extraordinary and compelling reason for release.

2241/PRE-BOOKER/CAREER OFFENDER. The Southern District of West Virginia adopted the Magistrate recommendation to grant the 2241 filed by James Chambers. Chambers v. Maruka, 2022 U.S. Dist. LEXIS 7674 (S.D. West Virginia January 10, 2022). Chambers has a walk away escape and argued that under Chambers v. United States, 555 U.S. 122 (2009), he was no longer a career offender. The Magistrate agreed. (DE 22).

2241/FSA TIME CREDITS. The Government re-reviewed the Bureau of Prisons (BOP) determination regarding FSA good time credit eligibility for Rachel Padgett. Padgett v. Strong, 2021 U.S. Dist. LEXIS 55826 (N.D. Florida February 16, 2021). Padgett was convicted of conspiracy to distribute methamphetamine pursuant to 21 U.S.C. 841(b)(1)(C). The BOP informed Padgett she was ineligible for "Earned Time Credits under the First Step Act due to [her] classification as the organizer for a drug trafficking organization. Padgett exhausted administrative remedies and filed a pro se 28 U.S.C. 2241. The Government agreed that 21 U.S.C. 841(b)(1)(C) offenses were eligible unless death results. As a result of the concession, the case was dismissed.

2255/PLEA NEGOTIATIONS. The Northern District of Illinois granted an evidentiary hearing regarding the 2255 filed by Jose Maldonado. United States v. Maldonado, 2022 U.S. Dist. 6765 (N.D. Illinois January 13, 2022). Maldonado claimed that his counsel was ineffective in advising him to reject a plea deal. He contends that he would have accepted a 15-or 20-year sentence, he told counsel this, and that the government in fact offered his attorney a plea deal that called for a "base term of twenty years of imprisonment," and would have allowed counsel "the freedom to argue any potential sentence enhancements 3553 factors that might reduce the twenty-year base term." Counsel "squandered that opportunity to cap the sentence," Maldonado argues, by assuring him that he could win acquittal or be sentenced to a term shorter than 20 years, should he be convicted at trial.

MEDICAL CONDITION. The District of Connecticut granted the CR/RIS motion filed by Rocky Samas. United States v. Samas, 2022 U.S. Dist. LEXIS 4151 (D. Connecticut January 10, 2022). Samas who has recently turned 50 years old is vulnerable to

*27*



TRULINCS ████████████████████████ - Unit: DAN-O-A

--------------------------------------------------------------------------------

COVID-19. As confirmed by prison medical records filed under seal, he suffers from hypertension and cerebrovascular disease, and he is obese with a body mass index of 36.7.

FSA/851. The Eastern District of Louisiana granted the CR/RIS motion filed by Rudy Cabrera. United States v. Cabrera, 2022 U..S. Dist. LEXIS 4148 (E.D. Louisiana January 7, 2022). In line with other circuits, the Fifth Circuit recently ruled that certain First Step Act amendments can constitute an extraordinary and compelling reason for a sentence reduction under 3582(c)(1)(A). See United States v. Cooper, 996 F.3d 283, 286, 289 (5th Cir. 2021) (instructing the district court to consider on remand whether "the nonretroactive sentencing changes to his 924(c) convictions, either alone or in conjunction with any other applicable considerations, constitute extraordinary and compelling reasons for a reduction in sentence"). The Court said the same applies to 851s.

FSA/924(c). The Eastern District of Michigan granted, in part, the CR/RIS motion filed by Tyrone Watkins. United States v. Watkins, 2022 U.S. Dist. 6567 (E.D. Michigan January 12, 2022). Since Watkins filed his reply, the court of appeals has issued rulings that require the Court to consider whether Watkins' stacking argument, together with his remarkable rehabilitation and the pandemic, provide extraordinary and compelling reasons for such relief. See United States v. McCall, 2021 U.S. App. LEXIS 37351 (6th Cir. Dec. 17, 2021). In McCall, the court of appeals clarified that "a court may consider a nonretroactive change in the law as one of several factors forming extraordinary and compelling circumstances qualifying for sentence reduction under 18 U.S.C. 3582(c)(1)(A). Because the government used the specter of stacked mandatory minimum sentences to compel Watkins to plead to an upwardly revised sentence range, and, as Judge Cohn found, inappropriately encroached on the Court's sentencing discretion, and because Watkins's conduct in prison has been commendable, this case falls outside the mine run of compassionate release requests based exclusively on claims of rehabilitation and remorse.

CAREER OFFENDER/PRISON CONDITIONS. The District of Maryland granted the CR/RIS motion filed by Shawn Moore. United States v. Moore, 2022 U.S. Dist. LEXIS 7632 (D. Maryland January 14, 2022). Moore argued that his asthma and the effects of the pandemic at FCI Petersburg, as well as the nonviolent nature of his offense, his record of rehabilitation, and his interest in spending time with his children, warranted compassionate release. The Court concluded that an inmate is eligible for compassionate release, notwithstanding vaccinated status. See, e.g., United States v. Jenkins, 2021 WL 5140198, at **4-5 (D. Md. Nov. 4, 2021). At the time of defendant's offense, conspiracy to distribute a controlled substance under 21 U.S.C. 846 was considered a career offender predicate offense under U.S.S.G. 4B1.2(b). But, in United States v. Norman, 935 F.3d 232, 238-39 (4th Cir. 2019), the Fourth Circuit determined that federal drug conspiracy under 18 U.S.C. 846 is categorically not a qualifying offense for career offender purposes. And, although Norman is not retroactive, the Court is not required to ignore it. In addition, Moore's incarceration in the midst of a global pandemic has "sufficiently increased the severity of the sentence beyond what was originally anticipated. United States v. Green, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); see also United States v. Park, 2020 WL 1970603, at *5 (S.D.N.Y. Apr. 24, 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

MEDICAL. The Southern District of West Virginia granted the CR/RIS motion filed by David Hicks. United States v. Hicks, 2022 U.S. Dist. LEXIS 7677 (S.D. West Virginia January 14, 2022). In this case, the extraordinary and compelling circumstance that demands an immediate modification of Mr. Hicks's sentence is that he is terminally ill. In his Response to the Government's Opposition to his Emergency Motion for Compassionate Release, he stated that his BOP doctor informed him that short of a total liver transplant, for which he is currently ineligible, his illness is fatal.

LONG COVID/PRISON CONDITIONS. The Southern District of California granted the CR/RIS motion filed by Alfonso Martinez.. United States v. Martinez, 2022 U.S. Dist. LEXIS 7280 (S.D. California January 13, 2022). Martinez argued extraordinary and compelling circumstances exist which justify a sentence reduction because placed him at increased risk for severe illness if he were to contract COVID-19 again, and he continues to suffer from long-term effects of his earlier COVID infection. Further, he argues that the global pandemic has increased the severity of his sentence, due to the modifications in prison life. The Court held that Hypertension, obesity, and serious mental health conditions are all underlying health conditions that can make an individual more likely to get severely ill from COVID-19.

INADEQUATE MEDICAL CARE. The District of Columbia granted the CR/RIS motion filed by William Robinson. United States v. Robinson, 2022 U.S. Dist. LEXIS 6233 (D.C. District of Columbia January 12, 2022). Robinson, he was unable to fit in FMC Butner's MRI machine due to his morbid obesity, and Dr. Beyer requested that he be taken to Duke Medical Center to have an MRI in their larger machine. The Complex Medical Warden, however, denied Dr. Beyer's request. The government does not dispute Robinson's purported medical conditions or his inability to receive necessary treatment. In fact, the government points to additional medical records warranting concern, including that Robinson appears to be experiencing severe diabetic neuropathy, causing him a considerable amount of pain that is not currently managed.

CCE/The Southern District of New York granted the CR/RIS motion filed by James Piggott. United States v. Piggott, 2022 U.S.

TRULINCS ~~████████████~~ Unit: DAN-O-A          Exhibit (G-4)

--------------------------------------------------------------------------

Dist. LEXIS 5293 (S.D.. New York January 11, 2022). Piggott has myriad severe health issues, including hypertension, diabetes, cirrhosis, chronic kidney disease, anemia, heart palpitations, high triglycerides, and several others and he takes more than ten separate medications daily.. The Court finds that Piggott's age, serious physical medical conditions, and the length of time he has already served incarcerated support a finding of "extraordinary and compelling" circumstances. Given the strong evidence of Piggott's serious medical conditions, his advanced age, and his rehabilitation during twenty-six years of incarceration, the Court finds that the "totality of the circumstances" point to the existence of "extraordinary and compelling reasons" for a reduction in his sentence.



Exhibit H

```
DANGQ  540*23 *            SENTENCE MONITORING          *    09-30-2021
PAGE 001        *          COMPUTATION DATA             *    09:25:25
                          AS OF 09-30-2021


REGNO..: 77425-066 NAME: BROWN, JOAN P


FBI NO...........: T4AK4XCPX         DATE OF BIRTH: 08-10-1940  AGE:  81
ARS1.............: DAN/A-DES
UNIT.............: C                 QUARTERS.....: O02-002L
DETAINERS........: NO                NOTIFICATIONS: NO

HOME DETENTION ELIGIBILITY DATE: 03-20-2024

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE: 07-21-2024 VIA GCT REL
```

6-21-2023 Halfway House

```
----------------------CURRENT JUDGMENT/WARRANT NO: 010 ----------------------

COURT OF JURISDICTION...........: PENNSYLVANIA, EASTERN DISTRICT
DOCKET NUMBER...................: DPAE:2:19CR000501-00
JUDGE...........................: WOLSON
DATE SENTENCED/PROBATION IMPOSED: 05-20-2021
DATE COMMITTED..................: 08-23-2021
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO


            FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.: $1,700.00     $00.00        $00.00       $00.00

RESTITUTION...: PROPERTY:  NO  SERVICES:  NO      AMOUNT:  $1,016,900.00

 REMARKS.......: CASE NUMBER: DPAE:2:19CR000501-001

----------------------CURRENT OBLIGATION NO: 010 ---------------------------
OFFENSE CODE....:  101    18:656 EMBEZZLEMENT BANK
OFF/CHG: 18:657 THEFT, EMBEZZLEMENT, ABSTRACTION OF FUNDS BY CREDIT
         UNION AGENT (CTS.1,5,9,13,17 AND 21);
         18:1006 FALSE CREDIT ENTRIES IN CREDIT UNION RECORDS (CTS.2-3,
         6-7, 10-11, 14-15, 18-19 AND 22)


SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
SENTENCE IMPOSED/TIME TO SERVE.:   41 MONTHS
TERM OF SUPERVISION............:    5 YEARS
DATE OF OFFENSE................: 01-13-2015




G0002       MORE PAGES TO FOLLOW . . .
```



Exhibit (I)



**FCI DANBURY**
**Health Services**

Form:   **Inmate Request for Compassionate Release Consideration**

| TO: SOCIAL WORK Ms Adamson | DATE | 12 21 21 |
|---|---|---|
| FROM (print) DAVID BRESCON | REGISTER NO: 77625-066 | |
| Signature: Box | UNIT Camp B-Unit | |

Instructions: In order to be considered for Compassionate Release, you must complete this form and send it to the Social Worker. The information will be used to determine if your request for Compassionate Release meets the minimum guidelines for consideration, as referenced in the Program Statement 5050.50, Compassionate Release/Reduction in Sentence.  Please be sure to submit a completed packet with any supporting documents.

1. Check the category you are requesting Compassionate Release Consideration: (only one per request)

Request based on Medical Circumstances
- ☐ Medical Terminal (estimated life expectancy of 18 months or less)
- ☒ Medical Debilitated (completely disabled, unable to perform activities of daily living and totally confined to a bed or chair OR only capable of limited self-care and confined to a bed or chair more than 50% of waking hours)

Request based on Non-Medical Circumstances-Elderly Inmates
- ☐ Request based on Elderly Inmates over 65 with Medical Conditions who have served more than 50% of sentence
- ☐ Request based on inmates age 65 or older who have served the greater of 10 years or 75% of the term of imprisonment to which the inmate was sentenced
- ☐ Request based on Elderly Inmates over 70 who have served 30 years or more of their term of imprisonment (offense that occurred on or after November 1, 1987)
- ☐ Request based on Death or Incapacitation of the Family Member Caregiver where you are the only caregiver for your minor child
- ☐ Request based on Incapacitation of a Spouse or Registered Partner where you are the only available caretaker

2. Explain the extraordinary or compelling circumstances, which could not have been foreseen at the time of your sentencing you believe warrant Compassionate Release consideration. Continue on back, if necessary That my medical conditions would be able not be able to be cared for my Mie is 88 yrs old - Severe hearing a threat of COVID death.

3. Explain your proposed Release Plans and continue on back, if necessary.  The information should include the following detailed information:
1. Address and phone number of where you plan to live.
7415 Brous Ave Philadelphia, PA 19152 w/ Family Friend Marion Ness 215-756-1889
2. Your family supports in the community.
My Family Friend Marion Ness
3. How you plan to cover your medical expenses and support yourself.
I call continue to use my Self Insurance Keystone 65 a custamer of Blue Cross Blue Shield
4. Where continued health treatment and services will be received.
To one Family physcion Dr Richard 104 2 Farmer St., Bristol, PA 19007 • 215-785-2626

Sensitive Limited Official Use Only

December 2020
FCI DAN

* Attached List of Medical Conditions + Cerrent Medications

(31)

*Exhibit I-2*

BROWN, JOAN P
Register Number: 77425-066
Unit: O-A

You requested a reduction in sentence (RIS) based on concerns related
to being medically debilitated.  After careful consideration, your
request is denied.

Title 18 of the United States Code, section 3582(c)(1)(A), allows
a sentencing court, on motion of the Director of the BOP, to reduce
a term of imprisonment for extraordinary or compelling reasons.
BOP Program Statement No. 5050.50, Compassionate Release/Reduction
in Sentence: Procedures for Implementation of 18 U.S.C. §§
3582(c)(1)(A) and 4205(g), provides guidance on the types of
circumstances that present extraordinary or compelling reasons, such
as the inmate's terminal medical condition; debilitated medical
condition; status as a "new law" elderly inmate, an elderly inmate
with medical conditions, or an "other elderly inmate;" the death
or incapacitation of the family member caregiver of the inmate's
child; or the incapacitation of the inmate's spouse or registered
partner.  Your request has been evaluated consistent with this
general guidance.

A review of your current medical record shows you are diagnosed with
diabetes, cardiac stents, hypertension, anemia with blood
transfusion. On assessment although you have a progressive illness,
you are not completed disabled or only capable of limited self- care.
Additionally, in review of your presentence investigation report,
the court was aware of your medical conditions, and sentenced you
below the guideline range due to your age. At this FCI Danbury
continues to provide treatment for your continued needs.

The BOP is taking extraordinary measures to contain the spread of
COVID-19 and treat any affected inmates.  We recognize that you,
like all of us, have legitimate concerns and fears about the spread
and effects of the virus.  However, your concern about being
potentially exposed to, or possibly contracting, COVID-19 does not
currently warrant an early release from your sentence.  Accordingly,
your RIS request is denied at this time.

If you are not satisfied with this response to your request, you
may commence an appeal of this decision via the administrative remedy
process by submitting your concerns on the appropriate form (BP-9)
within 20 days of the receipt of this response.

_____                    _1/12/22_____
T. Pullen, Warden                           Date

Exhibit I-3

4 1/14/22

**U.S. DEPARTMENT OF JUSTICE**                                    **REQUEST FOR ADMINISTRATIVE REMEDY**

Federal Bureau of Prisons

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Joan Brown                          77425-066           B              FCI CAMP
      LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.              UNIT              INSTITUTION

**Part A- INMATE REQUEST**

I am appealing Administrations decision to deny my request for CR/RIS, BOP Program Statement no 5050.50. In accordance with DOJ memo dated April 13, 2021, concerning updated home confinement guidance to now include allowing the Warden to refer inmates for placement in the community due to COVID risk factors outside of the listed CARES Act factors (i.e. for inmates who may not have completed 50% or more of their sentence or may have more than 18 months remaining on their sentence) to the Correctional Programs Division for further consideration. (See attached)

1-14-2022
    DATE                                                  SIGNATURE OF REQUESTER

**Part B- RESPONSE**

    DATE                                                  WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**                                        CASE NUMBER: _____

                                                        CASE NUMBER: _____

**Part C- RECEIPT**

Return to: _____
          LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.              UNIT              INSTITUTION

(33)

Exhibit I-4

1-14-2022

My medical conditions are progressive, and while I've taken the responsible steps in taking the vaccine, along with the booster, I have contracted COVID-19. In addition, upon an in-person visit with Mr. Escobar, and after reviewing my medical conditions, Mr. Escobar, in his professional opinion, has reccomended my case for CR/RIS/HC. My medical vulnerabilities certainly outweigh any public safety concerns. I have a non-violent charge; I am a first-time offender; I am 81 years old and I have multiple medical vulnerabilities wich CDC lists as top tier conditions on their Table of Evidence. Based on these compelling reasons, I am requesting that you reconsider my request for CR/RIS/HC.

Thank you,

Joan Brown

77425-Odo

Ms. Joan Brown 77425-066
Federal Prison Camp
33 1/2 Pembroke Rd.
Danbury, CT 06811

    

Honorable Judge Wilson
James A. Byrne
US Court House
601 Market Street
Philadelphia, PA 19106-1729

U.S.M.S.
X-RAY



RECEIVED
FEB - 4 2022

FEDERAL CORRECTIONAL INSTITUTION DANBURY
33 1/2 PEMBROKE ROAD DANBURY, CT, 06811
DATE:_____ 1/31/22
THE ENCLOSED LETTER WAS PROCESSED THROUGH
SPECIAL MAIL PROCEDURES FOR FORWARDING TO YOU.
THE LETTER HAS BEEN NEITHER OPENED NOR INSPECTED.
IF THE WRITER RAISES A QUESTION OR PROBLEM OVER
WHICH THIS FACILITY HAS JURISDICTION, YOU
MAY WISH TO RETURN THE MATERIAL FOR FURTHER
INFORMATION OR CLARIFICATION. IF THE WRITER
ENCLOSES CORRESPONDENCE FOR FORWARDING
TO ANOTHER ADDRESSEE, PLEASE RETURN
THE ENCLOSURES TO THE ABOVE ADDRESS.